Filed 5/14/14  In re A.J. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | B251993 (Los Angeles County Super. Ct. No. CK97412) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.K., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of the County of Los Angeles, Philip Soto, Judge.  Affirmed.

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

## INTRODUCTION

K.K. (mother), the mother of minor A.J., appeals from the juvenile court's order refusing to return custody of A.J. to her at the six-month review hearing. According to mother, there was insufficient evidence to support the juvenile court's finding that returning A.J. to mother's custody would create a substantial risk of detriment to him.

We hold that there was sufficient evidence to support a finding of detriment to A.J. if he was returned to mother's care. We therefore affirm the order not returning him to her custody.

## FACTUAL AND PROCEDURAL BACKGROUND

A.J. and mother came to the attention of the Department of Children and Family Services (DCFS) based on a referral from a mandated reporter. The reporter advised DCFS that police officers picked up A.J. at his school so a bruise on the side of his face could be photographed. According to a police officer, A.J. told him that mother had hit his face eight times, and that mother had hit him often before.

When a childrens social worker (CSW) interviewed A.J., he told her "'mom slapped me . . . she slapped me like eight times.'" A.J. also told the CSW that "'it's happened a lot of times, but not with a bruise like this one.'" In addition, A.J. informed the CSW that mother hit him with a belt and an extension cord, but he could not remember the last time she had done so. When asked if his stepfather[1] ever hit him, A.J. replied, "'he gets me with the belt sometimes.'"

The CSW next interviewed mother who told her the following about the incident. On the issue of whether she had hit A.J. causing the bruise to his face, mother stated,

---

[1]  Mother explained that although A.J. did not have a legal stepfather, A.J. referred to her boyfriend as his stepfather because the boyfriend had acted in that capacity since A.J. had been born. Accordingly, mother's boyfriend, who is not a party to this appeal, is referred to as the stepfather.

"'Ya, I popped him . . . it was just once. I don't know where that bruise came from though. He didn't have a bruise last night and he didn't have a bruise this morning when I dropped him off at school.'" Mother hit A.J. with an open hand, and she had done so in the past, but never hard enough to leave a bruise or mark. Mother, however, had never hit A.J. with a belt or an extension cord. Mother did not use drugs, have a criminal history,[2] or have any mental issues.

The CSW also interviewed A.J.'s stepfather who explained that he did not see mother strike A.J. and he did not believe she would ever hit him hard. He did not see a bruise on A.J. the night before and did not see a bruise on him when he left for school the next morning.

On January 20, 2013, DCFS filed a Welfare and Institutions Code section 300[3] petition based on alleged physical abuse of A.J. by mother and the stepfather. On January 23, 2013, the juvenile court detained A.J. from mother's custody, placed him in shelter care, granted DCFS discretion to place him with any appropriate relative, and granted mother monitored visitation. The juvenile court also ordered DCFS to provide appropriate referrals to address the issues raised in the petition.

In a February 20, 2013, jurisdiction/disposition report, a CSW advised the juvenile court that when she reinterviewed A.J., he told her, "My mom slapped me, slapped me, slapped me!'" According to A.J., mother whipped him, slapped him, and hit him with an extension cord. But A.J. asked the CSW not to "'tell the judge [mother] hit [him] with a belt.'" He also told the CSW that his stepfather hit him with a thick belt while he was playing on the bed.

When the CSW reinterviewed mother, she again admitted to striking A.J., but claimed she meant to strike him on the shoulder, not in the face. Mother again denied

---

[2]     The detention report stated that in February 2008, mother had been convicted of assault with a deadly weapon not a firearm likely to produce great bodily injury and was ordered to serve 36 months probation.

[3]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

seeing any bruise on A.J.'s face and questioned why no one at A.J.'s school noticed the bruise until after 10:00 a.m. Mother also again denied hitting A.J. with a belt or extension cord and explained that she usually "'pop[ped]'" A.J. with an open hand on the shoulder when he would do something "'crazy.'" Mother denied that the stepfather hit A.J. with a belt, explaining instead that the stepfather only threatened to hit A.J. with a belt.

At the jurisdiction/disposition hearing on March 11, 2013, the juvenile court sustained the petition, declared A.J. a dependent of the court, and removed him from mother's custody. The juvenile court granted mother monitored visitation with A.J. and ordered mother to participate in individual counseling and a parenting program, specifying that "mother's individual counseling [was] to address proper child discipline, *mother's mental health*, and child protection." (Italics added.) The March 11, 2013, case plan executed by mother also provided that mother was to participate in individual counseling to address, inter alia, "*mother's mental health*." (Italics added.) The juvenile court set a six-month review hearing for September 9, 2013.[4]

In an August 28, 2013, status review report, DCFS reported that A.J. had moved from his foster home to the home of his maternal grandmother. DCFS further advised that mother enrolled in anger management counseling at "Free N One" on March 14, 2013. On August 20, 2013, DCFS received a progress report from a Free N One counselor that stated, in part, "[Mother] is currently enrolled in Free N One Outpatient Program, a licensed drug and alcohol program. . . . [¶] [Mother] attends group and individual sessions for [a]nger management and individual counseling. She is required to attend twice a week. [¶] Since her enrollment, [mother] started the program with commitment. She demonstrates a positive attitude and regular attendance. [Mother] also attends Parenting. . . ." The letter further advised that mother had completed the 12 required parenting sessions and 25 required group sessions.

---

[4] The juvenile court subsequently advanced the six-month review hearing to September 6, 2013.

In a telephone conversation with mother's counselor,[5] a CSW was informed that mother's counseling was not being provided by a licensed therapist or an intern being supervised by a licensed therapist. When the CSW informed the counselor that mother should participate in counseling provided or supervised by a licensed therapist, the counselor agreed to refer mother to a licensed therapist. DCFS recommended that reunification services be extended for an additional six months so that mother could complete the court-ordered services.

At the September 6, 2013, six-month review hearing, DCFS informed the juvenile court that mother had not enrolled in the previously ordered individual counseling and that mother's counselor had confirmed that the counselor's agency did not provide individual counseling through licensed therapists or supervised interns. After hearing argument, the juvenile court ordered mother to provide all information regarding her counselor to the CSW, noting that, "I've already made the order [to participate in individual counseling]. You [mother] have to follow the order. You have to have a counselor that is approved by [DCFS] and the court." The juvenile court set the matter for a contested hearing on October 10, 2013.

On September 18, 2013, the CSW spoke to mother's counselor who informed the CSW that the counselor's agency had arranged for the services of a clinician trained to provide mental health counseling, but mother refused to participate in such counseling because she claimed that she had not been ordered to do so. On September 23, 2013, the CSW met with mother, provided her with a list of low-cost DCFS-approved counselors who could address mental health and child protection issues, and accompanied mother to a counseling center to inquire about such services.

On October 2, 2013, the CSW again advised mother that she was required to enroll in individual counseling with a DCFS-approved counselor. When mother explained that she did not know where to go to receive the required counseling, the CSW suggested that

---

[5] The status review report did not specify the date of the conversation between the CSW and mother's counselor; it merely indicated that the conversation took place sometime prior to the August 28, 2013, report.

5

she contact the counseling center they had visited or another provider from the list the CSW had given her.

At the October 10, 2013, contested hearing, the juvenile court observed, "It appears that [mother] has not completed the case plan and seems to be somewhat confused apparently by what was ordered by the court which we can clear up. But the risk still remains as far as I can tell, and [DCFS is] asking that we continue with service so we could try and get mother and child reunified." In response, mother's counsel asserted that mother was in full compliance with her case plan and that the language in the disposition order about individual counseling for mental health issues was vague. After extensive argument, the juvenile court noted that at the disposition hearing, mother's counsel did not argue that "the mental health request by [DCFS] in the case plan signed by [mother] . . . was vague." When mother's counsel confirmed that she had not made that argument at the disposition stage, the juvenile court stated: "It [that argument] should have been done there. All right? Like I told County Counsel, this [case plan] is a contract. Okay? I'm not allowing collateral information, oral information, to augment what everybody said or did, and I'm not going to allow it here either. We ha[d] an agreement and we still have an agreement and the mother signed the agreement to go to therapy for mental health issues." The juvenile court then ordered as follows: "The social worker is to give [mother] a referral for a licensed therapist. She's to go within the next 30 days and begin with a psychiatric assessment as needed. That's what was ordered at the [disposition hearing]. That's what is ordered now. [¶] And we'll go ahead with the following: if [mother is] doing her plan, if we've satisfied this mental health issue and there doesn't seem to be any risk to going on with overnight visits, then we'll start with one time overnight. We've had a graduated plan before and this is a case that appears to be appropriate for that. [¶] . . . [¶] But I'm finding there is still a risk involved here and by a preponderance of the evidence returning the child to the mother would continue to have a substantial risk of danger to the child or detriment to the physical safety, emotional well-being of the child. Mother is found in partial compliance. I am making a reasonable efforts finding on behalf of [DCFS]."

6

## DISCUSSION

### A.     Standard of Review

Mother's contention that there was insufficient evidence at the six-month review hearing to support the juvenile court's order refusing to return A.J. to mother's care is governed by the substantial evidence standard of review. "At the six-month review hearing, the court is required to return the child to the parent's physical custody unless the Agency proves, by a preponderance of the evidence, that return would create a substantial risk of detriment to the child's physical or emotional well-being. (§ 366.21, subd. (e).) [Under the substantial evidence standard, w]e review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R*. (1991) 2 Cal.App.4th 538, 545 [3 Cal.Rptr.2d 217].) '*The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental*.' (§ 366.21, subd. (e).) [¶] In reviewing whether the record contains substantial evidence that returning [a child] to [a parent's] custody would have been detrimental to her, we must keep in mind that the purpose of the reunification plan is 'to overcome the problem that led to removal in the first place.' (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 [53 Cal.Rptr.2d 687].)" (*In re Mary B*. (2013) 218 Cal.App.4th 1474, 1483, italics added.)

"'Substantial evidence' means evidence that is reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. (*In re N. S*. (2002) 97 Cal.App.4th 167, 172 [118 Cal.Rptr.2d 259].) In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody. (*Rita L. v. Superior Court* [(2005)] 128 Cal.App.4th [495,] 505.)" (*In re Yvonne W*. (2008) 165 Cal.App.4th 1394, 1401.)

### B. Analysis

Mother contends that there was insufficient evidence at the six-month review hearing to support the juvenile court's finding that there would be a continuing risk of detriment to A.J. if he was returned to mother's custody. According to mother, the juvenile court's order concerning individual counseling for mental health issues was vague, and DCFS failed to timely inform her that such counseling must be with a licensed therapist. Therefore, mother argues, at the time of the six-month review hearing, she was in substantial compliance with her case plan and, as a result, no longer a risk to A.J.

Assuming, without deciding, that mother did not understand that the required counseling for mental health issues needed to be provided by a licensed therapist, there was evidence that she was apprised of that requirement well in advance of the review hearing, yet failed to even begin to comply with it. In the August 28, 2013, status review report, a CSW informed the juvenile court that sometime prior to the date of the report, she had advised mother's counselor that the required individual counseling for mental health issues could only be provided by a licensed therapist. In response to that advice, mother's counselor assured the CSW that she would refer mother to a licensed therapist. Thus, almost six weeks prior to the October 10 contested review hearing, mother was presumably aware of the nature and extent of the individual counseling requirement for mental health issues. Nevertheless, at the time of the September 6 review hearing, she had made no effort to comply, and the juvenile court explicitly ordered her to participate in individual counseling with a therapist approved by DCFS and the court. Thereafter, on September 18, the CSW again spoke with mother's counselor who informed the CSW that she had arranged for counseling by a clinician trained to provide mental health counseling, but mother refused to participate in such counseling, purportedly because she believed—notwithstanding the juvenile court's explicit September 6 order—that the juvenile court had not ordered it. On September 23, 2013, the CSW gave mother a list of approved counselors and then accompanied her to a counseling center to inquire about such services. On October 2, 2013, the CSW yet again advised mother that she was required to enroll in individual counseling with a DCFS-approved counselor, but mother

8

claimed she did not know where to go to obtain such services—notwithstanding the list she had been provided and her visit to a counseling center that provided those services. Despite all of DCFS's attempts to ensure mother's compliance with the individual counseling requirement, her attorney argued at the October 10 contested hearing—for the first time—that the order concerning such services was vague, i.e., mother had not complied because she was unsure of the nature and extent of the requirement.

The foregoing facts constituted substantial evidence supporting the juvenile court's implicit conclusion that mother knew or should have known of the individual counseling requirement for mental health issues and that she was willfully refusing to comply with it. That willful noncompliance with a court-ordered treatment program, in turn, was prima facie evidence that return would be detrimental to A.J., evidence that mother did not rebut. Therefore, contrary to mother's assertion, there was sufficient evidence in support of the juvenile court's order refusing to return A.J. to her custody.

# DISPOSITION

The juvenile court's order refusing to return A.J. to mother's custody at the six-month review hearing is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, Acting P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.