Filed 3/3/14  In re Lilliana L. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re LILLIANA L., a Person Coming Under the Juvenile Court Law. | B248835<br>(Los Angeles County<br>Super. Ct. No. CK92600) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ALFREDO L.,<br><br>        Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County.
D. Zeke Zeidler, Judge.  Affirmed.

        Marissa Coffey, under appointment by the Court of Appeal, for Defendant and
Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel,
Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

                    _____

Alfredo L. appeals from the dependency court's order denying his request to restore custody or allow unmonitored visits with his daughter. We affirm.

## FACTS

### The First Appeal[1]

Lilliana L., born in October 2001, is the subject of this dependency case. At the time the proceeding was initiated, she lived in a household consisting of: herself; her father, Alfredo L. (Father); her mother, Patricia L. (Mother); her adult sister, Nicole L. (Nicole); Nicole's fiancé, Alfred H. (Alfred); Alfred's three-year-old daughter, Melody H. (Melody); Alfred and Nicole's infant daughter, Anna H. (Anna); Lilliana's adult brother, Freddy L.; and a family friend and his son.

Many of the relevant facts in the first appeal involved then three-year-old Melody. Custody of Melody was shared by Alfred and Melody's mother, Lorena A. (Lorena).

Beginning in May 2011, the Department of Children and Family Services (DCFS) received a number of referrals that Melody was being abused. In December 2011, Lorena called the sheriff's department after Melody was dropped off at her home and Lorena noticed bruising on the inside of Melody's thighs and in her vaginal area. Melody was medically examined on December 6, 2011. The report indicated that she had bruising in her inner thigh and pelvic region, as well as on her labia majora. Bruising and scratch marks were also observed on her lips, naval area, thighs, and lower back. Bruising was observed on her hymen that appeared consistent with penetration of her vagina. On December 9, 2011, dependency proceedings were initiated on Melody's behalf, alleging that she sustained injuries, including to the vagina, while in the care of Alfred, and that she was physically abused by Nicole.

In January 2012, a DCFS social worker interviewed Melody. Melody told the social worker that Nicole is mean and hit her "here," pointing at her inside thigh, vagina,

---

[1] This is the second appeal in this case. We summarize the facts and procedural history detailed in the unpublished opinion in the first appeal, B244080, filed December 4, 2013.

and arm. She further said that "daddy" hit her and pointed to the same areas. Both Nicole and Alfred denied ever making inappropriate physical or sexual contact with Melody. They did not know how Melody suffered injury. Father was also interviewed and denied knowing how Melody was hurt.

Later in January 2012, Melody was interviewed again. She said that both Nicole and "daddy" hit her. The dependency investigator asked, "Does your daddy or Nicole hit or touch you anywhere else?" Melody responded that her "daddy" did. When asked where, she responded, "on my colita," and pointed to her vagina. Melody showed the investigator how daddy rubbed her vaginal area with his hands. She said she had her clothes off, and it occurred in the bedroom she shared with Lilliana. When asked whether anything else was done to her "colita," she said that daddy put "the pokey stick" in it. She said it hurt, and after she told her daddy "no," he stopped using the pokey stick.

Detective Marlene Vega of the Los Angeles County Sheriff's Department Special Victims Bureau was assigned to investigate the matter. On January 30, 2012, Detective Vega received a phone call from Lorena. Lorena told her that Melody identified "Nicole's daddy" as the one who hurt her vagina. Melody told Lorena that Father covered her eyes, told her not to cry or say anything, and hurt her "colita." The next day, Detective Vega received a phone call from Melody's therapist, who said that Melody sometimes referred to Father as "daddy." Melody told the therapist that Father covered her eyes and hurt her "colita." Detective Vega showed Melody pictures of various men and asked if any of them hurt her "colita." Melody put her finger on Father's picture and said, "Him."

Father categorically denied sexually abusing Melody or anyone else. He said that he had never been left alone with Melody. He speculated that Melody was coached by Lorena to identify him as a molester, saying that Lorena had a long-standing dislike for Nicole and the family due to Nicole's relationship with Alfred. According to Father, Melody occasionally referred to him as "dad," but never "daddy," as that was her name for Alfred. Mother stated that she did not know how Melody was injured. She said that her husband worked long hours and was rarely home, and was never left alone with

3

Melody. Lilliana stated that she had never been abused by anyone. A forensic examination of Lilliana yielded negative results for physical or sexual abuse.

On February 28, 2012, Alfred wrote a letter to Detective Vega and the DCFS social worker stating that Father was an honorable man, had nothing to do with the abuse against Melody, and had never been left alone with Melody.

On February 29, 2012, Melody was interviewed again. She referred to Alfred as "daddy" and said Nicole's father's name was "just dad." Melody then said that "Nicole's dad" put a pokey stick in her "colita" and it went "up, up, up" and almost made her "throw up.

On March 19, 2102, DCFS filed a Welfare and Institutions Code section 300[2] petition on behalf of Lilliana, alleging Father sexually abused Melody, which placed Lilliana at risk. The petition was subsequently amended to allege that Mother knew or should have known of the abuse by Father, that both Mother and Father knew or should have known of the abuse by Alfred and Nicole against Melody, and that they unreasonably failed to protect Lilliana. Mother moved out of the family home with Lilliana. Lilliana was detained from Father and released to Mother. Both parents were cooperative and amenable to DCFS services, and Father enrolled in sexual abuse counseling.

In April 2012, Alfred wrote another letter to Detective Vega. The letter stated that he had caused the bruises to Melody's buttocks, vagina, and inner thigh area by hitting her with a shoe. When interviewed, Alfred denied ever sexually abusing Melody, however, and added, "That's on him," referring to Father.

A psychologist met with Lilliana in June 2012 to assess suitability of counseling and reunification. Lilliana told him that she loved both of her parents and wished to resume living with Father because she missed him. The psychologist found Lilliana well-adjusted and determined that she did not face a high safety risk from Father. He did not

---

[2]      Unless otherwise noted, all further statutory references are to the Welfare and Institutions Code.

4

recommend any further counseling sessions for Lilliana, and he recommended that the family reunify.

The jurisdictional hearing was held in August 2012. DCFS called Melody's mental health therapist, who testified that Melody told her that Father had hurt her "colita" with the pokey stick. DCFS also called a pediatrician certified in child abuse pediatrics, who testified that Melody's injuries were consistent with a penetrating force to the genital area, and that sexual abuse was highly suspected. Father called Mother and Nicole, who both testified that Father could not have caused Melody's injuries or sexual abuse. A physician called by Father testified that Melody's injuries were not consistent with penetration to the vagina or sexual abuse. After hearing the evidence and argument, the dependency court found that Father sexually abused Melody. It assumed jurisdiction over Lilliana pursuant to section 300.

The contested dispositional hearing was held in September 2012. The dependency court admitted the same testimony and documents as it did for adjudication and, additionally, admitted various documents that had previously been excluded on the basis of lack of authentication. Luz Celaya, a therapist, was called to testify by Father. Father had 24 sessions with Celaya. Celaya testified that, based on her observations of Father during their sessions, she did not find any behavior indicating a risk of harmful conduct toward others. Father participated openly in the sessions and appeared truthful. He never accepted the allegations made against him. Nevertheless, the dependency court concluded that there was clear and convincing evidence of a substantial danger to Lilliana's physical and/or mental health. Care, custody, and control were ordered taken from Father, and Lilliana was placed with Mother. Reunification services were ordered for Father, and he was allowed visitation with Lilliana.

Father challenged the jurisdictional and dispositional orders on appeal. This Court affirmed the judgment, finding that substantial evidence supported the dependency court's conclusion that Father sexually abused Melody, and that substantial evidence supported the order removing Lilliana from Father's custody.

5

## Events Following Disposition

As of December 2012, Mother had participated in individual counseling for over two months, completing 11 sessions. Her therapist observed clear and healthy relationship boundaries within the family, and did not see the need for any further therapy. Mother had also attended 10 out of twelve parenting sessions.

The social worker spoke with Father's therapist, who expressed skepticism that Father had committed sexual abuse, and believed that the court "got it wrong." Father had completed court-ordered courses and attended seven individual counseling sessions with the therapist. He had also engaged in individual counseling with two prior therapists. The social worker was concerned that Father's therapist concentrated on the question of Father's guilt rather than treatment. The social worker noted, however, that all three therapists who worked with Father believed that he did not sexually abuse Melody. Father's current therapist felt that Father was depressed and missed his family. The therapist observed a close, loving relationship between Father, Mother, and Lilliana. Father was cooperative and open to the counseling process, and presented no defensiveness or abnormal thoughts. The therapist concluded that Father did not pose any risk to his family or the community.

Both Father and Mother continued to deny that Father was involved with Melody's abuse. They both believed that Alfred caused her injuries by physically abusing her. Father had learned from his courses that abuse is generally perpetrated by family members, not strangers. He said that he and Mother had a "plan of action," and they "cleaned house." Father had asked the family friend, who had lived with the family for many years, to leave.

Lilliana, who was then 11 years old, continued to reside with Mother. Lilliana told the social worker that she loved Father, that she was not afraid of him, and that he had never hurt her. She wanted to move back with Father into the family home. In November 2012, the social worker monitored a visit with Father where Lilliana was allowed to visit the family home for the first time since being detained from Father.

6

Lilliana was very excited to see her home, her bedroom, and her pets. Lilliana appeared comfortable with Father, and Father acted appropriately with her.

Father had monitored visits three to four times a week, with a family friend as monitor. The family visited together on Wednesdays, when they would attend church. On weekends, they would go to movies and eat together. Mother and Lilliana reported no problems with the visits.

The social worker monitored another visit in February 2013. Lilliana was excited to be at the family home. She greeted Father, played with the dogs, and went to see her room. Lilliana made cookies while Father watched. She was very happy and wanted to watch a movie with Father but could not do so since the visit was for only one hour.

Lilliana was doing well in Mother's care, had no behavioral problems, and was getting good grades in school.

As of March 5, 2013, Mother had successfully completed parenting classes, individual counseling, and a sexual abuse awareness program, even though the awareness program had not been ordered by the court. Father continued to participate in individual counseling. He completed parenting classes, and also, on his own volition, completed a sexual abuse awareness group, even though he had not been ordered to do so.

Father's therapist reported that he was progressing in therapy and told her he would never be alone with a child again—"no longer coaching little league baseball, or dropping off and picking his daughter up from school." He expressed a great sadness for what had happened to Melody and continued to deny that he abused her. Father's therapist also continued to believe that the allegations against Father were false. The social worker remained concerned that each of the therapists seen by Father expressed a belief that he was innocent. The social worker felt that the therapists should instead concentrate on the sustained allegations of abuse, and believed that Father could not make progress in therapy so long as he denied the allegations.

A team decision-making meeting was held in February 2013 to determine if DCFS could safely close the case. Because the parents were married and still a couple, and because both parents denied that Father abused Melody, DCFS recommended that

7

the current orders remain in place. DCFS believed that if jurisdiction were terminated with an order that Father not reside in the home, Mother and Father would seek to change the order.

A contested hearing was set for April 15, 2013. According to the DCFS report, Father told the social worker that he had learned to protect Lilliana from sexual abuse by noting different behavioral patterns, such as isolation from the family and fear of certain people. Father reiterated that he wished for Mother and Lilliana to move back into the family home. He said he welcomed family therapy upon reunification.

Father's therapist, Ronda Gilbert, testified at the hearing. She had seen Father for about 15 hour-long individual counseling sessions. She opined that Father did not pose a current risk to Lilliana. Gilbert believed that Father had a very strong relationship with his wife and family, and that reunification was in the best interest of the family. The dependency court asked Gilbert whether she believed Father fit the profile of a perpetrator. Gilbert responded that he did not, but that the issue was irrelevant because the allegations had already been found true. Gilbert acknowledged, however, that her opinion Father did not pose a future risk of abuse was based on her assessment that he did not exhibit behaviors characteristic of abusers. Father had always been candid with Gilbert and did not exhibit any guardedness.

Father's counsel argued that Lilliana should be placed in the parents' home, with Father allowed to reside in the home. Counsel for Mother and Lilliana concurred. Counsel for DCFS argued that Father should not be allowed to live in the same home as Lilliana, because it would pose a substantial risk. DCFS's counsel characterized Father's interactions with his therapists as attempts by him to convince them that he was innocent. DCFS requested that Father be appointed a different therapist.

The dependency court found, by a preponderance of the evidence, that continued jurisdiction was warranted. The court stated that the therapist recommendations and conclusions were premised on the idea that Father never posed a risk to Lilliana, rather than accounting for the court's prior findings of abuse. The court left all prior orders intact.

Father timely appealed.

## DISCUSSION

In any matter in which a minor has been declared a dependent, the dependency court holds review hearings at least once every six months. (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 649.) When a child has been adjudged a dependent, but has not been removed from a parent, review is governed by section 364. (*Id.* at p. 650.) When proceeding under section 364, the issue of reunification is generally not the court's concern, since the child remains placed with a parent; rather, the court is to determine whether continued supervision is necessary. (*Gabriel L.*, at p. 650.)

Normally an order made following a section 364 hearing is subject to a substantial evidence standard of review. (See *In re N. S.* (2002) 97 Cal.App.4th 167, 172.) However, as acknowledged by Father on appeal, at the April 2013 hearing, he sought for Lilliana to be placed with him in the family home. Custody determinations are committed to the sound discretion of the dependency court, and will not be disturbed unless an abuse of discretion is clearly established. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

We find that the dependency court's order declining to restore Father's custody, or to allow unmonitored contact with Lilliana, was not an abuse of discretion.[3] Melody suffered severe abuse. The dependency court found that Father sexually abused Melody, and we affirmed this determination as being supported by substantial evidence. As we previously noted, "Cases overwhelmingly hold that sexual abuse of one child may constitute substantial evidence of a risk to another child in the household. . . ." (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 968, fn. omitted (*In re K.R.*).)

---

[3] DCFS argues that Father's appeal was rendered moot by the dependency court's order of November 15, 2013, which permitted Father to reside with Mother and Lilliana, with protective orders in place. We agree with Father that this appeal is not moot because the order did not return Lilliana to Father's custody.

9

The finding of sexual abuse was made approximately seven months prior to the order on appeal. Having made the finding that Father committed sexual abuse, the dependency court did not err by exercising further caution at this stage of the proceedings. "[A]berrant sexual behavior directed at one child in the household places other children in the household at risk, and this is especially so when both children are females." (*In re K.R.*, *supra*, 215 Cal.App.4th at p. 970.) It was not an abuse of discretion for the dependency court to effectively hold that prevention of risk toward Lilliana was currently in her best interest. (See *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 ["When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child."].)

Nevertheless, we do note that DCFS appears to have partially based its recommendations that Lilliana remain living separate from Father on Mother's and Father's continued denials of the sexual abuse. Their denials are not reason enough to continue supervision and jurisdiction. As stated in *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 (*Blanca P.*): "Few crimes carry as much (or as much deserved) social opprobrium as child molestation. Most people would rather be accused of bank robbery. The crime is usually done in secret. Proof is often difficult. Perpetrators are not likely to admit their guilt. The victims of molestation may be too young, too frightened, too embarrassed or too dependent to provide credible evidence against the molester. And innocent children need protection. [¶] But by the same token, it cannot be denied that it is an outrageous injustice to use the fact parents deny they have committed a horrible act as proof that they did it. That really is Kafkaesque. And by the same token it is also unjust to use the fact that a parent denies molesting his or her child as the reason to terminate reunification services—at least when (assuming we can be certain of such matters) the parent has been falsely accused. Further, it is undeniable that false accusations of child molestation do happen." (*Id.* at pp. 1752-1753, fn. omitted.)

The facts of this case differ from those in *Blanca P.* In *Blanca P.*, there was negligible evidence that the child had been sexually molested, and the dependency court committed various procedural errors. (45 Cal.App.4th 1738, 1741-1744.) In this case, a

10

physician expert testified that Melody had experienced sexual abuse, and Melody identified Father as the perpetrator.  However, the emphasis of these proceedings should not be on whether Father and Mother admit to something that they have denied.  Rather, the emphasis must be on Lilliana's best interest, which is unlikely to be affected by whether DCFS can force an admission.

## DISPOSITION

The April 15, 2013 order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.


11