Filed 8/4/14  J.C. v. Super. Ct. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.C.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A142051<br><br>(Contra Costa County<br>Super. Ct. No. J13-00347) |

**INTRODUCTION**

J.C. (Father) files this petition for extraordinary writ challenging an order terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26.[1]  He asserts no substantial evidence supports the juvenile court's findings of substantial detriment if the minor is placed in his care, and of no substantial probability of reunification within six months.  We conclude the findings are adequately supported and deny the petition.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

We set forth the facts in relation to Father as previously stated in our opinion in case No. A138876, from which we quote pertinent portions[2]:

"G.C.[3] was born March 17, 2013. G.C. is mother's first child. G.C. was detained following a hearing on March 22, 2013. Weekly supervised visitation of one hour with both parents was ordered.

"On March 26, 2013, a petition was filed under section 300, subdivision (b) alleging that 'there is a substantial risk that the child will suffer serious physical harm or illness because mother is unable to adequately supervise or protect the child due to the mother's untreated mental illness.' The petition was amended to include the allegation of a substantial risk of harm to G.C. as a result of father's anger management and substance abuse problems.

"On April 16, 2013, father waived his right to a jurisdictional hearing and pleaded no contest to the allegation of the amended petition . . . . [¶] . . .

"On March 19, medical social worker Dominguez went to mother's hospital room to ask father to meet privately with her. He was disheveled, angry, loud, and smelled of alcohol. He yelled at her, 'I'm tired of being woken up. I'm having to meet with people every 15 minutes.' When asked if he had been drinking, he yelled, 'I had a few drinks last night and it's none of your business.' He added: 'I don't need to be woken up for this. . . . I'm not talking to you. You're going to write things down like a third grade teacher and then stuff a microscope up my ass.' He stormed out of the social worker's office; the social worker called security, but father left the hospital before security arrived. Hospital staff was informed not to allow him back in.

"When interviewed by [Contra Costa County Children and Family Services] Bureau social worker Julie Lutz, mother said father had a child from a previous relationship he could not raise because he had accidentally given his ex-wife a black eye

---

[2] On our own motion, we take judicial notice of our opinion in case No. A138876. (See Evid. Code, § 451, subd. (a).)

[3] In the first opinion, J.C.W. was referred to as G.C.

while protecting himself, and he was arrested for that. She admitted she and father engaged in pushing, shoving and grabbing, but he never bruised her. He gets angry and rants and raves, and the police had been out to his home a few times, but no one had been arrested. She was a little concerned about father being around the baby because he gets angry and yells a lot.

"Social worker's interview of mother on March 19 apparently ended when father returned to the room in a highly agitated state. Informed by the social worker of the upcoming detention hearing, he pointed at her face and said 'this is all your fault' in a threatening manner. He said he would be back with some friends. He yelled and stormed around the room until two sheriff's deputies arrived and escorted him out of the room.

"Father had a prior child welfare history from 2000 concerning the four-year-old son of a prior girlfriend. There were substantiated allegations of physical abuse to the child caused by father spanking the boy hard enough to leave bruises, and of general neglect by the mother for failing to protect the child from physical abuse by him. The child also witnessed incidents of domestic violence between his mother and father." (*In re G.C.* (Apr. 2, 2014, A138876) [nonpub. opn.].)

Father's April 2013 reunification plan required a 52-week anger management program, parenting education, individual counseling, outpatient substance abuse program, substance abuse testing, and attendance at 12-step program one to two times per week. In August 2013, Father's attorney filed a motion to be relieved as counsel after Father made a movie regarding a complaint about this attorney to the State Bar in which he depicted pictures of a cat sharpening its claws while stating " 'I'm going to do a little Bitch slapping.' " The court granted the motion.

Father initially refused to engage in services, but then provided documents indicating he began anger management classes in September 2013. Father then posted two videos on social media sites in which "he made threatening and aggressive statements against the Bureau, social workers and child's attorney," stating "he is a very angry man and if anyone comes between him and his child, he was going to go after

3

them." At a supervised visit with the minor on November 5, 2013, Father told a social worker " 'I know people, you know . . . my father and grandfather are tough . . . military people . . . . I know people in the mob . . . you understand why I don't like anyone controlling me.' "

At the six-month status review hearing in January 2014, Father submitted evidence he had attended 34 NA/AA meetings between October 31, 2014 and January 6, 2014, completed 20 hours of anger management instruction, enrolled in, but had not started, two parenting classes, completed 20 hours of instruction in parent education seminars, and attended six individual counseling sessions and six anger management classes. The court found that return of the minor would create a substantial risk to her wellbeing, and ordered that Father receive additional reunification services and have supervised visitation.

The first unsupervised visitation between the minor and Father was scheduled for March 25, 2014. While a friend of Father's, Ben Laskari, was driving him to the visit, Father began repeatedly punching the driver with a closed fist. Two motorists called police to report the incident, and Father was arrested at the Bureau's office. Laskari denied being hit, and later went to one of Father's anger management classes and "start[ed] telling them that nothing happened[, they] . . . didn't have any fight." When asked about the incident at the 12-month review hearing in May 2014, Father refused to answer questions and stated he wanted to "plead the Fifth." Giving the same reason, Father also refused to answer questions about threatening his previous attorney. He did, however, acknowledge posting a message on Facebook stating he was going to bulldoze down the "department of social services."

A social worker testified she performed Internet research regarding Laskari, because he "would always be present during the visit [with the minor] in the lobby, and he requested several times to attend the visits to visit the child." On four occasions, Laskari "became aggressive in his conversations" with the social worker. She discovered Laskari had posted "hundreds and hundreds" of videos of soft-core pornography on the

4

Internet, linked to his Facebook page which indicated he was a screenwriter. Laskari told the police officer who responded to the March 25 incident that he met Father at the county hospital, and thought he would "be a good actor in one of [his] films." The social worker had a discussion with Father about "what is safe for the child and who should be around [her]." Father told her he was unaware of the films and agreed to investigate, but the relationship between Father and Laskari continued. The social worker learned Laskari had appeared at one of Father's anger management classes to deny that the punching incident occurred.

At the conclusion of the 12-month review hearing, the court found there was a substantial risk of detriment if the minor was returned home to Father's custody. The court stated "The violent incident in the vehicle is a key factor in this case. Driving down the street, hitting or striking a driver of a vehicle is not only a strong indicator that the violence tendencies are still up front with [Father], that he does not have safety plans or controls over his triggers. . . . [¶] I also find the risk to be real. This record is replete with evidence from [Father's] side that he's gone to multiple classes. . . . There's an old saying, it's easy to talk the talk, but it's tough to walk the walk. And I listened to [Father's] testimony, and he clearly knows the rules and the things you're supposed to follow, but they have not been internalized yet. And his insight was very lacking. If he had real safety plans, he would have used those instead of striking Mr. Laskari. [¶] So I do find that there is a substantial risk—a definite risk to the child if the child is returned home. There's no way in my mind that it would be safe to return that child home. [¶] The evidence also shows that [Father] is reluctant to break off a relationship with Mr. Laskari that is either supportive of his domination over the man or perhaps involving other issues that would not be healthy for the child to be raised in [that] environment . . . ."

The court terminated reunification services to Father and set a hearing under section 366.26.

DISCUSSION

**Substantial Risk of Detriment**

Section 366.21 provides in part: "The permanency hearing shall be heard no later than 12 months after the date the child entered foster care. . . . At the permanency planning hearing, the court shall determine the permanent plan for the child, which shall include a determination of whether the child will be returned to the child's home. . . . After considering the relevant and admissible evidence, the court *shall* order the return of the child to the physical custody of his or her . . . parent *unless* the court finds, by a preponderance of the evidence, that the return of the child . . . would create a *substantial risk of detriment* to the safety, protection, or physical *or emotional well-being* of the child. The social worker shall have the burden of establishing that detriment." (§ 366.21, subd. (f), italics added.)

"The court shall also determine whether reasonable services that were designed to aid the parent or legal guardian to overcome problems that led to the initial removal and continued custody of the child have been provided or offered to the parent. . . . In making its determination, the court shall review and consider the social worker's report and recommendations . . . shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided, taking into account the particular barriers to an incarcerated . . . parent's or legal guardian's access to those court-mandate services and ability to maintain contact with his or her child . . . ." (§ 366.21, subd. (f).) "The court may not order that a hearing pursuant to Section 366.26 be held unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent . . . ." (§ 366.21, subd. (g)(1)(C).)

California Rules of Court, rule 5.715 similarly provides that at the 12-month hearing, the court "must order the child returned to the custody of the parent or legal guardian unless the court finds the petitioner has established, by a preponderance of the evidence, that return would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . . [¶] . . . [¶] (4) If the court does not

6

order return of the child to the parent . . . the court must specify the factual basis for its finding of risk of detriment to the child . . . ." (Cal. Rules of Court, rule 5.715(b)(1), (4).) "If the child is not returned to the custody of the parent or legal guardian, the court must consider whether reasonable services have been offered or provided. . . ." (Cal. Rules of Court, rule 5.708(e).)

Father maintains there was no substantial evidence of risk of detriment to the minor because he fully complied with his reunification plan, and his visits with the minor were appropriate.

"[S]imply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated." (*In re Dustin R*. (1997) 54 Cal.App.4th 1131, 1143.) Father did not begin to comply with the reunification plan until eight months after the dependency proceeding was initiated. And even after he began attending anger management classes and counseling sessions, he did not apply what was imparted. Indeed, after participating in these reunification services, and while en route to his first unsupervised visit with the child, he repeatedly punched Laskari and was arrested at the visit. Additionally, although Father was appropriate in his interaction with the minor during the supervised visits, his behavior in relation to those visits was not appropriate. He brought Laskari with him to visits, and had to be prevented from videotaping the minor during the visits in violation of a court order.

Father claims the court inappropriately based its holding on his failure to "internalize" information from the programs in which he had been enrolled, relying on *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1751 (*Blanca P*.).) In *Blanca P*., unsubstantiated sexual abuse allegations were made against the father. The mother participated in parenting classes as part of her reunification plan, but she "refus[ed] to believe her husband [was] a child molester." (*Id*. at p. 1751.) The social worker and a therapist opined that mother had "not 'internalized' what she ha[d] learned in parenting

7

classes," and recommended against reunification. (*Ibid.*) The Court of Appeal held "[t]he idea that, despite enduring countless hours of therapy and counseling (much of it predicated on the possible erroneous assumption that her husband is a child molester), a parent who has faithfully attended required counseling and therapy sessions must still relinquish her child because she has not quite 'internalized' what she has been exposed to has an offensive, Orwellian odor. The failure to 'internalize' general parenting skills is simply too vague to constitute substantial, credible evidence of detriment." (*Ibid.*, fn. omitted.)

The circumstances in this case have no relation to those in *Blanca P*. The court did not rely on some vague notion of failure to internalize parenting education. Instead, the fact Father punched Laskari while driving Father to his first unsupervised visit with the minor amply demonstrated Father had not internalized any aspect of the anger management training.

Father also claims there was no substantial risk of detriment because "[t]he <u>one</u> incident he engaged in involved a full grown adult male," and he had never been abusive to the minor. He relies on *In re Jasmine G.* (2000) 82 Cal.App.4th 282 (*Jasmine G.*), a case in which the court reversed the juvenile court's dispositional order continuing the out-of-home placement of a teenager based in part on her mother's "rough" removal of the minor's nose-ring.[4] The court held "There is no evidence that the removal was against [the minor's] will—it appears that she was somewhat ashamed herself of having acquired the nose stud and so readily accepted [Mother's] demand that it be removed— only that the removal was done, perhaps, too roughly. That is not clear and convincing evidence of any danger." (*Id.* at p. 292.)

---

[4] We note Father's brief incorrectly describes the facts of that case as "the parent of a fifteen-year-old female slapped her daughter upon discovering that [the minor] . . . had gotten a 'nose ring'." Actually, the mother, with the minor's acquiescence, removed a nose stud, albeit "roughly," that the minor had acquired after removal from her parents' custody and while in foster care. The initial detention was based on the parents' use of corporal punishment. (*Jasmine G.*, *supra*, 82 Cal.App.4th at pp. 291–292.)

*Jasmine G.* likewise has no relation to the circumstances in this case. Father has a long history of violent behavior, including prior substantiated allegations of physical abuse of the four-year-old child of a former girlfriend, and an incident of domestic violence involving that girlfriend for which he was convicted of a felony. Contrary to his assertion, he was neither involved in only one incident of violence, nor was it with only a "full grown adult male." Further, until fairly recently, Father has threatened violence against his attorney and the Bureau. In a meeting with a domestic violence liaison in September 2013, Father stated " 'I am a very dangerous person. If you go after my blood, you need to look out. I don't want to hurt anyone over my child . . . I can see why somebody might want to come down with a machine gun.' " Despite completion of numerous anger management classes, on the first day he was to have unsupervised visitation with his child, he punched the friend who was driving him to the visitation. The fact that Father has never physically harmed his child during supervised visitation does not demonstrate the juvenile court's finding of substantial risk of detriment was not supported by substantial evidence.

**Substantial Probability of Return of Minor to Father Within Six Months**

Father claims the court erred in finding there was no substantial probability of the minor's return to his custody in six months because his "compliance with his case plan is uncontroverted."

" 'The dependency scheme sets up three distinct periods and three corresponding distinct escalating standards for the provision of reunification services to parents of children . . . . During the first period, which runs from roughly the jurisdictional hearing (§ 355) to the six-month review hearing (§ 366.21, subd. (e)), services are afforded essentially as a matter of right (§ 361.5, subd[s]. (a), . . . (b)). During the second period, which runs from the six-month review hearing to the 12-month review hearing (§ 366.21, subd. (f)), a heightened showing is required to continue services. So long as reasonable services have in fact been provided, the juvenile court must find "a substantial probability" that the child may be safely returned to the parent within six months in order to continue services. (§ 366.21, subd. (e).) During the final period, which runs from the

9

12-month review hearing to the 18-month review hearing (§ 366.22), services are available only if the juvenile court finds specifically that the parent has "consistently and regularly contacted and visited with the child," made "significant progress" on the problems that led to removal, and "demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)–(C).)' [Citation.]" (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1057–1058.)

Although Father has substantially completed the reunification services provided, his failure to make significant progress on his severe anger management issues despite those services demonstrates there is no substantial probability of return of the minor to his custody within six months. Even after individual counseling, anger management training, parenting classes and AA/NA meetings, Father was unable to refrain from violent behavior. Because of his attack on the friend driving him to what would have been his first unsupervised visit with the minor, Father has never been allowed unsupervised visits with the child. The court did not err in finding there was no substantial probability of return of the minor to his custody within six months.

## DISPOSITION

The petition for extraordinary writ is denied. This decision is final immediately as to this court. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

10

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Margulies, J.

A142051, *J.C. v. Superior Court of Contra Costa County*