Filed 6/3/15  In re N,R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.R., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067089 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ014851) |
| v. | |
| L.J., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

L.J. (Mother) appeals from an order of the juvenile court issued at the contested six-month review hearing on a juvenile dependency petition filed by the San Diego County Health and Human Services Agency (the Agency) on behalf of her daughter N.R. (born 2001). Mother contends the Agency failed to provide reasonable reunification services to her because it failed to facilitate conjoint therapy. She seeks reversal of the juvenile court's finding that reasonable services had been provided with directions to the Agency to provide her additional services. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In early September 2013, the Agency received a child welfare referral indicating N.R.'s stepfather, Brian H., hit her with a wooden spoon and belt, causing multiple bruises. The social worker observed large linear bruises on N.R.'s arms and buttock, but Mother stated she never witnessed any abuse and claimed N.R. probably bruised herself or bumped into a wall. The social worker took N.R. into protective custody and detained her in a foster home after N.R. claimed Mother was lying. A doctor at Polinsky Children's Center documented 11 areas of injury on N.R., including patterned bruises, abrasions, and loop shaped bruises. She concluded "the multiple inflicted injuries on this child are the result of severe, [and] vicious and repeated incidents of inflicted trauma (physical abuse). To return [N.R.] to an unchanged environment could further jeopardize this patient's health and expose her to further injury and/or death." After seeing photographs of N.R.'s injuries, Mother stated she had no idea how N.R. obtained them, that she and Brian did not abuse N.R. and claimed N.R. was making up stories and rebelling against them because they did not let N.R. do the things she wanted to do.

2

The Agency filed a petition on behalf of N.R. and the juvenile court later ordered N.R. detained, removed her from Mother's custody and deferred making visitation orders until N.R. was in counseling. It also ordered services to be provided as soon as possible and authorized "conjoint counseling when deemed appropriate for the mother and the child." (Capitalization omitted.) At the October 2013 jurisdiction and disposition hearing, Mother set the case for trial. At a later settlement conference, the Agency amended the petition to allege Mother's failure to protect N.R. Mother pleaded nolo contendre to the new count and the juvenile court dismissed the counts of the original petition and allowed supervised visitation.

In November 2013, N.R. left her foster placement because the foster mother was fearful about caring for N.R. In December 2013, N.R. left her second foster placement after N.R. attempted suicide by strangulation through use of her own hands and a belt noose. A physician diagnosed N.R. with major depressive disorder with psychotic features and recommended N.R. take medication for her depression and auditory hallucinations. Over Mother's objections, the juvenile court granted the request to administer N.R. psychotropic medication. In February 2014, the juvenile court ordered that N.R. be placed at San Pasqual Academy (SPA), a residential facility. At the February 2014 contested disposition hearing, the juvenile court removed N.R. from the custody of her parents, declared N.R. a dependent and ordered the Agency to provide Mother with reunification services consistent with the case plan. The court also authorized the therapist at SPA to encourage conjoint therapy if deemed appropriate for N.R.

At the initial conjoint therapy session in August 2014, Mother's failure to mention the abuse N.R. suffered resulted in N.R. feeling frustrated, angry and hurt. The therapist reported that Mother was unable to communicate with N.R. in a supportive or empathetic way and did not pick up on N.R.'s emotional cues. The therapist opined conjoint therapy was not appropriate and might be detrimental to N.R. at that time, given the Mother's denial of the abuse.

At the contested six-month review hearing in October 2014, the juvenile court heard testimony from the social worker, Mother, Mother's therapist and the conjoint therapist. The juvenile court found that Mother had made substantive progress with the provisions of her case plan, that reasonable services had been provided to Mother, ordered further reunification services and set a 12-month review hearing date.

## DISCUSSION

Mother contends the juvenile court erred in finding that reasonable reunification services had been provided because the Agency failed to facilitate vital conjoint therapy for her and N.R. She notes that conjoint therapy did not occur for a year after being ordered and was attempted once, but the conjoint therapist was unprepared for the session and then failed to follow-up after the session. Mother argues that conjoint therapy was critical to the reunification process, but the Agency did nothing to facilitate conjoint therapy after the one failed attempt, such as having her and N.R.'s individual therapists, and the future conjoint therapist communicate to set up a conjoint therapy session. Although the trial court ordered an additional six months of services, Mother claims that unless the order is reversed she will be prejudiced by the juvenile court's ruling later in

4

the proceedings. The Agency argues that Mother's claim of future prejudice is speculative and submits the services provided were reasonable under the circumstances, especially given N.R.'s status, background and emotional state. As we shall explain, we agree with the Agency.

The purpose of a reunification plan is "to overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) "Each reunification plan must be appropriate to the particular individual and based on the unique facts of that individual." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako*).) To support a finding of reasonable services, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Misako*, *supra*, 2 Cal.App.4th at p. 547.) The remedy for failing to offer or provide reasonable services is to extend the reunification period and continue services. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 975.) When a party challenges the finding that reasonable services were offered or provided, we determine whether there is substantial evidence to support the court's finding by reviewing the evidence most

favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. (*Misako*, at p. 545.)

After considering the reports and carefully listening to the testimony, the juvenile court addressed the issue of Mother's services at length. It found that Mother and N.R. were progressing in their individual therapy. It noted that while the circumstances surrounding the conjoint therapy session were not ideal, the session "derailed" not because of its structure but because of "the intensity of the interaction between the Mother and [N.R.]." Although the conjoint therapy session did not go well, the court noted this was not necessarily a negative as the session provided additional information. In hindsight, the court believed it was premature to begin conjoint therapy at that time. It noted that the issue of admitting abuse is a therapeutic issue with both Mother and N.R. holding "very deeply held perspectives of what happened" that do not match. The court believed the case would ultimately be successful, but expressed doubt that Mother and N.R. were at the point they could be productive in conjoint therapy.

The juvenile court's astute comments and ultimate finding that the Agency provided reasonable services to Mother are supported by the record. The juvenile court authorized conjoint therapy at the detention hearing "when deemed appropriate" for Mother and N.R. (Capitalization omitted.) The initial case plan provided for Mother and N.R. to "participate in conjoint therapy once feedback is received from their respective therapists and deemed appropriate in order to address their relationship and any problems that may arise." It was not until late June 2014 that the therapists for Mother and N.R. agreed conjoint therapy would be appropriate. Nothing in the record suggests the Agency

6

could have done anything to advance conjoint therapy or did anything to delay conjoint therapy. Rather, it appears Mother's actions may have contributed to the delay. The record shows that from early April 2014 to June 2014, N.R. refused to participate in visitation after she received a letter from Mother that included list of things N.R. needed to " 'work on' " including that she " 'forgive' " Brian. This letter greatly upset N.R. When visitation resumed in early June 2014, encouraging visits with Mother prompted N.R. to agree to conjoint therapy.

In early August 2014, Mother and N.R. attended a conjoint therapy session after their respective therapists felt it was an appropriate time to begin conjoint therapy. The conjoint therapist believed she would be evaluating N.R. for joint therapy and, ideally, would have liked to have separately interviewed Mother and N.R. and reviewed reports from their individual therapists. Nonetheless, the therapist had an opportunity to speak with N.R. individually and learned about N.R.'s allegations of abuse by the stepfather and Mother's belief that N.R. lied and made things up. When Mother entered the room, N.R. became uncomfortable and wanted Mother to sit as far away from her as possible. N.R. became angry after Mother refused to mention abuse as the reason for conjoint therapy. When N.R. pleaded with Mother to be honest about their home situation, Mother skirted the issue. The therapist observed Mother's inability to calm N.R. or engage in supportive and empathic dialogue with N.R. The therapist discharged N.R., concluding "conjoint therapy may be detrimental to [N.R.]'s emotional state and [she] would not benefit from the process at this time" given her emotional distress during the session and Mother's denial of the abuse.

Mother's complaint regarding the adequacy of her services centers on the Agency's failure to facilitate conjoint therapy after this one failed attempt. The record shows, however, that after this session, the social worker spoke to the individual therapists for N.R. and Mother. N.R.'s therapist agreed with the conjoint therapist's conclusion that conjoint therapy was not appropriate at this time. Thereafter, the social worker remained in constant contact with N.R.'s therapist and consulted another conjoint therapist, who declined to offer services until Mother accepted responsibility. The social worker and Mother's therapist also agreed it would be beneficial to have a treatment team update involving the social worker, Mother, N.R. and their individual therapists. The social worker also expressed her belief that conjoint therapy would be beneficial to N.R. once N.R. and N.R.'s therapist stated N.R. was ready.

Taken to its essence, Mother's argument boils down to an assertion that the Agency should have forced N.R. into conjoint therapy. We do not agree.

Mother's position ignores the conclusions of the conjoint therapist that N.R. would not benefit from conjoint therapy at this time and conjoint therapy might be detrimental to N.R.'s emotional state. N.R.'s statements and actions support this conclusion. In a report dated November 2014, the social worker noted that while N.R. loves Mother, N.R. has "never wavered from her wishes of not wanting to return home" as she does not believe Mother "is able to keep her safe" and "does not feel . . . Mother has taken accountability for her part in the reason for [the] removal." After Mother sent N.R. an "atonement letter," N.R. did not want to "process [the] letter or have any contact" with Mother despite encouragement from the Agency and N.R.'s therapist.

8

N.R. was 13 years old at the time of the contested six-month review hearing. The court-appointed special advocate assigned to the case described N.R. as "a bright and articulate young woman who, in many respects, is incredibly mature for her age" and who possesses a "grasp of complex concepts and situations" that belie her age. N.R. was of an age and maturity level to meaningfully express her feelings. Mother complains that it should not be up to N.R. or her therapist to decide whether conjoint therapy occurred. N.R., however, did not express her feelings about conjoint therapy, she expressed them about Mother. Her feelings about Mother have not changed primarily because Mother's attitude about the case and the abuse N.R. suffered has not changed. On this record we cannot conclude that the Agency's failure to schedule another conjoint therapy session rendered the services provided to Mother unreasonable. (Cf. *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 71 [Mother "seems to think her compliance with the terms of her reunification plan is all that was required for reunification to occur. But that position reflects neither reality nor the law. The juvenile court may decline to return a child to parental custody where, although that parent has complied with the reunification plan, the child continues to suffer severe emotional problems as a result of the parent's earlier abuse and where those problems would be exacerbated by return of the child."].)

Finally, it is important to note that the juvenile court ordered the Agency to continue providing services to Mother and scheduled the matter for a 12-month review hearing. Thus, even assuming the trial court erred, Mother suffered no prejudice. Although Mother argues the prejudice will manifest in a later phase of the proceedings, "Welfare and Institutions Code section 352 provides an emergency escape valve" should

9

the juvenile court determine N.R.'s best interests would be served by a continuance of a review hearing beyond the statutorily permissible time frame.  (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1798-1799 [juvenile court had discretion under Welf. & Inst. Code, § 352 to continue the 18-month review hearing and order the provision of additional reunification services].)

In summary, the record also shows Mother cares deeply for N.R. and wishes reunification.  As the juvenile court noted, however, this case presents "materially complex" emotional and therapeutic issues.  To echo the juvenile court's comments, to be successful in reunification both Mother and N.R. will require a lot of tears, courage and "give and take."

DISPOSITION

The order is affirmed.


McINTYRE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.