Filed 3/5/26  In re Travis R. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re TRAVIS R., Jr., et al., Persons Coming Under Juvenile Court Law. | B347799 (Los Angeles County Super. Ct. No. 25CCJP00335) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. TRAVIS R., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Eden Gharapet, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant-father Travis R. appeals from juvenile court orders assuming jurisdiction over his three children Travis R., Jr. (Travis, born June 2012), Eli R. (born January 2015), and Ariel R. (born November 2016), removing them from his custody, and adjudicating them dependents of the court. He contends substantial evidence supports neither the court's taking jurisdiction nor its removal of them from his physical custody, and that the court abused its discretion in declaring the children dependents of the court. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *DCFS Investigates an Abuse Referral*

In early February 2025, respondent Los Angeles Department of Children and Family Services (DCFS) received a report of child abuse alleging Father poured dishwashing soap into Travis's mouth as punishment and also dragged him by his hair from the dining room to the kitchen.

### 1. **Los Angeles Police Department**

A children's social worker (CSW) spoke with an LAPD officer who stated he had gone to the family's home to investigate child abuse and, after speaking with the children, had decided to

2

bring the children to the police station.  The officer reported that he learned of three incidents.

In the first incident, Travis was talking with Eli in their room when Father told them to go to sleep.  When Travis continued talking to Eli, Father brought Travis to the bathroom, made him sit on a chair, and poured one quarter of a bottle of dishwashing soap into his mouth.  Father told him to keep the soap in his mouth and sent him back to bed.  Travis waited until Father went to sleep before returning to the bathroom and spitting the soap out.  Both of Travis's siblings heard Travis yelling and screaming, saying: "daddy[,] give me one more chance, I'm sorry."

In the second incident, Travis was cleaning his room, and damaged one of the cameras in the home.[1]  When Father saw the footage of Travis damaging the camera, he poured "half" a bottle of dishwashing soap into Travis's mouth and made him hold it there for an hour.  Travis's stomach and throat began to burn and he felt like vomiting.  After Father permitted Travis to spit the soap out, he began coughing up blood.  He threw up twice or thrice more during the rest of the day.

In the third incident, Father received a text message from one of Travis's teachers saying Travis had been talking in class during reading time.  Father sat Travis down in a chair and put "a couple squirts" of dishwashing soap into his mouth, forcing

---

[1] Travis later explained that because he and his siblings returned home from school a few hours before Father returned home from work, Father installed cameras in the house to monitor them.

3

him to keep it there for 30 minutes.  Travis became dizzy and felt a burning sensation in his throat and stomach.[2]

The officer also reported Eli denied any abuse or neglect, although Eli admitted Father hit him with a belt or other object "a long time ago."  Eli said he was not afraid of Father.

In contrast, Ariel said Father "scares her a lot . . . with yelling and screaming in the home."  Ariel claimed Father instructed her not to say anything about "the soap incident with her brother" or about Father hitting her.  Ariel said she saw Father make Travis sit on the toilet and tilt his head back, after which Father poured dishwashing soap into his mouth.

### 2.    Travis

The CSW spoke with Travis, who confirmed all three incidents.  He stated the first incident (when he and Eli were talking when they were supposed to be sleeping) occurred on January 10, 2025, and estimated he held the dishwashing soap in his mouth for 12 minutes before he was able to spit it out.  He said the second incident (when he accidentally damaged one of the cameras) occurred on January 27, 2025, and that he swallowed some of the dishwashing soap.  While he was "coughing up blood," Father "was laughing and did not do anything to help him," saying this was Travis's fault for breaking the camera.  The third incident (when he was talking in class

---

[2] The police report stated that, when asked about using dishwashing soap as discipline, Father initially "stated that he did it once, and that was it," but after "he was confronted about how many times he used soap as a discipline," he "minimized the incident by stating that he meant to say that it was one incident as a whole."

4

during reading time) occurred the next day, on January 28, 2025. "Travis claimed his father grabbed him by the hair, dragged him to a chair and poured more than half of a bottle of dishwashing soap into his mouth." Travis accidentally swallowed some of the soap. Travis reported that, in the past, Father's discipline "primarily involved hitting him."

### 3. Eli

Eli repeated what he told the police officer, elaborating that the last time Father hit him—with a belt on his buttocks—was "sometime last year." Eli said Father punished him by making him write standards or sit in a chair for ten minutes. Eli opined Travis "gets into trouble" more than he did, and the last time Eli saw Father hit Travis was November or December 2024.

### 4. Ariel

Ariel also repeated what she had said to the police officer, adding that while she only saw Father put dishwashing soap in Travis's mouth once, she heard him cry when it happened the other two times. She also said Father had not spanked her in a "long time," but when he did, he "would make them put their face in a pillow while he hit them on the buttocks with a belt." Ariel opined that, if she were to go back home, Father would question her about what she told the police, "and if she does not tell him[,] he would probably hit her."

### 5. Father

The CSW spoke with Father, who explained Travis was frequently in trouble at school, leaving Father unsure how to handle the situation. Father "admitted to having used dishwashing soap on three separate occasions to discipline

5

Travis," claiming "he discussed the use of soap in the mouth as a disciplinary method with his therapist, and he reported that the therapist agreed it was ok[ay]." "Father stated that in his mind, there was nothing wrong with using soap as discipline," as it was an "appropriate method" of discipline that was not "abuse." When the CSW explained that "on the bottle of the soap it states it has chemicals and could have caused serious damage to the child's body[,] Father said 'it wasn't that much soap,' and he did not think it was a bad idea."

When the CSW asked Father whether he forced Travis to hold dishwashing soap in his mouth for an hour, Father said "he did not remember." However, he denied he forced Travis to hold it in his mouth until he was crying, drooling, or gagging. When told Travis had claimed he threw up blood, Father "was unaware of this" and denied it happened, surmising "Travis might be blowing things out of proportion." Father "attempted to minimize and justify the use of dishwashing soap as a disciplinary tool, stating that he was not a bad father and was trying to ensure his children stayed on the right path."

When "questioned . . . about an incident in which he allegedly dragged Travis by his hair after Travis got into trouble at school[,] Father stated, 'I don't know anything about that, but Travis might be putting extras on the situation.'" When the CSW expressly "asked if he had pulled Travis by the hair, father refused to answer."

Father stated that he and the children's mother had joint custody, with her having custody every other weekend.[3] Father

---

[3] In 2023, a family court ordered that, during the school year, Father would have custody of the children during the week, *(Fn. is continued on the next page.)*

said he had no issues allowing Mother to take the children. The CSW placed the children with Mother.

### 6. Mother

The next day, the CSW spoke with Mother, who reported that "every time" she picked the children up from Father, "they disclose details about the abuse they have experienced in the father's home." She said Travis had told her on one occasion about Father putting dishwashing soap in his mouth, and "she shared this with his family law lawyer, but no action was taken." Mother claimed she had been fighting to regain custody of the children "for years." Mother said she divorced Father "due to verbal abuse and racist slurs."

### B. *The Court Detains the Children*

A day after speaking with Mother, DCFS filed a petition under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (j), and (i), on behalf of the children.[4] Counts a-1, b-1, j-1, and i-1 alleged Father poured dishwashing soap into Travis's mouth on three occasions in January 2025 and additionally grabbed and dragged Travis by his hair on one of those occasions. Counts b-2, j-2, and j-3 alleged that, after Father poured dishwashing soap into Travis's mouth, Travis suffered from

_____

and Mother would have custody "on alternating weekends from Friday after school or 3:00 p.m. until Sunday at 7:00 p.m." During the summer, Mother would have custody for two weeks, followed by one week with Father, and then the cycle would repeat (i.e. another two weeks with Mother, followed by another week with Father, etc.).

[4] Undesignated statutory references are to the Welfare and Institutions Code.

dizziness and a burning sensation to his throat and stomach, and vomited blood, but Father did not obtain medical care for him. Mother was not named in the petition.

At the February 2025 detention hearing, the court found DCFS had made a prima facie case, detained the children from Father, and released them to Mother. The court granted Father monitored visits and expressed its hope that Father understood Travis was requesting a "cooling-off period" (i.e., a period in which he did not visit Father). The court also ordered the parents not to discuss case issues with the children.[5]

## C.    *DCFS Continues Investigating*

In mid-March 2025, a little over six weeks after DCFS placed the children with Mother, a dependency investigator (DI) spoke with the family about the allegations.

### 1.    Travis

In discussing the incident in which Father poured soap into his mouth because he was talking with Eli when they were supposed to be sleeping, Travis said Father had put some amount of dishwashing soap into his mouth—Travis said he forgot how much—and then Travis spit it out "after a few seconds and went to bed." Regarding the incident in which Travis accidentally broke the camera, Travis reiterated that Father poured "half" a bottle of dishwashing soap in his mouth and forced him to hold it there for "like 30 minutes." Travis "felt like throwing up most of the time" and he coughed up blood. Travis did not discuss a third incident.

---

[5] Although non-offending, Mother submitted to the jurisdiction of the court.

Travis also claimed Father often hit him with a belt—he estimated fifty times in four years—hard enough to leave bruises. Travis opined that when Father "thinks CPS can't touch him, he is going to hit me again."

Travis said Father used to drink a lot, sometimes leaving the children at home so he could go drinking with his friends. Travis stated Father once pushed him against a wall when he was under the influence of alcohol. Travis had also seen Father smoke marijuana. Travis reported Father would say racists things about Mexicans, which would sadden Travis and his siblings because "[w]e are half-Mexican."

### 2. Eli

Eli again said he did not see Father put dishwashing soap in Travis's mouth but he knew it happened "because my dad said he would do it." Although Eli said it was "fun" living with Father, he reported Father sometimes said things to the children like, "I fucking hate you." Eli also stated he would get hit with a belt. "It wasn't rare, but it was below average. Travis . . . would get hit by the belt above average, like once every two weeks. It's because Travis would get in trouble at school. [Father] hit Ariel too, but it didn't happen often." Eli claimed that during his current visits with Father, "[h]e would try to guilt trip me into saying stuff." Eli did not elaborate on what things Father tried to have him say.

### 3. Ariel

Ariel said she saw Father put dishwashing soap in Travis's mouth twice. The first incident occurred in the kitchen because Travis was not doing well in school, and Father put a "spoonful" of dishwashing soap into Travis's mouth, while "Travis was

9

begging him to stop." Travis started coughing. The second incident occurred in the bathroom at night after Travis and Eli were talking. Ariel said Travis had the soap in his mouth "for like 4 seconds" before he spit it into the sink. Ariel stated that, although Father disciplined Eli and her by forcing them to write standards, Father would hit Travis with a belt, approximately three times a week.

### 4. Mother

Mother claimed Father had a history of using inappropriate physical discipline on the children, stating the children would tell her during their visits that Father was hitting them. Mother opined Father had anger problems and claimed she suffered two incidents of domestic violence with him.

Mother recounted that, on the night the police removed the children from Father, Father called her and told her: "This is happening because . . . Travis is doing it for attention and said I did things to him." Father also told Mother that his therapist had instructed him to put dishwashing soap in Travis's mouth.

### 5. Father

Father claimed he only used dishwashing soap twice, not three times, explaining he could not have put soap into Travis's mouth on January 10, because that was Mother's birthday and the children were with her. When the CSW asked Father how he decided to use dishwashing soap as a punishment, he responded: "We all went through it. I had soap put in my mouth, the detective I spoke to said he had that too. I asked Travis'[s] therapist about using it. She said it was okay. I talked to her and asked, 'is using soap legal?' and she said it was. My therapist told me the same thing. It's a worldwide thing to do.

10

We have all been through it.  I didn't want to hit him.  Taking his electronics and standards weren't working.  I thought the soap would work, because kids don't like the taste.  When I caught him with the camera, I didn't know what to do.  I asked Travis what to do about his behaviors.  I did the soap thing twice.  I told him, let's do the soap thing.  This was the first time it happened."[6]  Father denied using force, stating he had Travis sit in a chair and then "put one or two drops of soap on the child's tongue."  He denied making Travis keep the soap in his mouth "for an extended period of time."

When asked how Travis responded to having dishwashing soap put in his mouth, Father said he would demonstrate.  He "grabbed a water bottle, and poured it in his mouth and started screaming in a very loud tone, coughing, and grabbing his throat until he was red in the face."  This continued for approximately 20 seconds.  When the CSW asked whether Travis was grabbing his throat and screaming, Father said, "Yeah, he was drying out his throat and being dramatic.  He was being a class clown.  I told him to spit it out and drink water.  But he just kept yelling.  He was drying out his throat."  Father denied Travis spit out blood, claiming "[h]e did spit up some red slime.  But it wasn't blood.  It must have been from when he was being dramatic and dried out

---

[6] In early April 2025, Father clarified his "therapist never told me to use soap.  I just asked if it was legal or illegal, it wasn't suggested.  I asked both therapists, I was concerned that I was doing something illegal.  Both had similar responses, saying other parents did it, but they don't suggest it."  Father's therapist also "denied recommending the use of dish soap as a form of punishment, reporting that she provided alternative options for the father to use."

his throat.  Maybe strep throat."  Father said he did not take Travis to the hospital because Travis did not want to go.

When asked if he understood dishwashing soap was poisonous and harmful to ingest, Father said he did not know that, and "now feels terrible about using it."  He said he would not use it again.  Father opined that Travis's accounts of the discipline were different than his because Travis was manipulating the situation to live with Mother and escape discipline from Father.

When the CSW asked Father what he would do differently, he responded, "honestly, I don't even know what I would do different."  When the CSW began "taking notes," Father added, "Don't write that down.  I was just trying to create structure.  I am going to parenting classes now to learn.  I would definitely not do this again.  I would just stick to taking away electronics again or having them sit on a chair."

In a late April 2025 Children and Family Teams meeting, Father appeared to have difficulty managing his emotions. Travis told a CSW that when he would beat Father at a video game, Father "would yell and scream at him, as well as push, smack him, and send him to his room."  A CSW raised the topic of unmonitored visits, but Father "stated that he did not feel safe or protected without a monitor due to the children's statements." However, ten days after the meeting, Father called a CSW, "upset, and questioned why he was not being given unmonitored visits with his children and blamed" the CSW.

In early May 2025, Father's attorney provided DCFS with a picture of a label on dishwashing soap that said: "KEEP OUT OF REACH OF CHILDREN.  If in eyes, may cause temporary discomfort; flush thoroughly with water.  If swallowed, drink a

glass of water to dilute." Father also provided messages between him and Travis's teachers, describing Travis's behavior problems. Father additionally sent an April 24, 2025 letter stating he was enrolled in "Project Fatherhood Men in Relationships Group (MIRG)," attesting Father "has attended MIRG 4 times and one-on-one parenting 3 times." The letter described Father as "highly engaged and attentive" and said he "asks questions and is receptive to utilizing appropriate and healthy parenting techniques both in group classes, and in one-on-one sessions. He has made significant progress in that he has recognized the difference between making disciplinary decisions based on fear or desperation and using discipline to teach and educate his children."[7]

### 6. Paternal Grandmother

In early April 2025, the DI spoke with the paternal grandmother (PGM). She stated she and Father had a "strained relationship and do not speak to one another." When the DI asked PGM if she had child-safety concerns, she said Father loved his kids but "goes about things the wrong way. He definitely needs help with counseling or parenting. That's all I am going to say about it." When pressed, PGM added, "I do not want to start any issues. All I want to say is Travis [Sr.] has good intentions, but he went about it the wrong way. I know there was a lot of yelling. All I am going to say is talk to the children and believe whatever they have to say."

---

[7] In a telephone conversation with the DI, the letter writer opined Father had taken accountability for his actions regarding disciplining Travis and would never do it again. The letter writer added Father was learning new discipline techniques.

In late April 2025, PGM called the DI to say "she did not appreciate that the father found out about her interview in the Jurisdiction/Disposition Report, as she was concerned about her safety." She stated, "You do not know what could happen, people could get hurt or killed. You guys opened a can of worms." PGM confirmed Father had contacted her about the report, but she did not want to disclose what he said. When the DI asked PGM if Father had threatened her, she responded, "Well, I am going to let you put two and two together. You already have your answer."[8]

### 7. Jennifer O.

Jennifer O. was Father's "Parent Partner" who was "providing him with guidance in regards to his current Dependency Case." In mid-May 2025, Jennifer "reported that when she has discussed the inappropriateness of putting dish soap in Travis'[s] mouth as a form of discipline, the father has reported . . . that he did it because his therapist told him to do it." Jennifer opined Father "has not taken full accountability for his actions and even though she has suggested alternate discipline methods, the father has continued to state that his therapist told him to use the dish soap." In a May 2025 status report, based on Jennifer's statement and the fact that Father "continues to provide evidence as to Travis'[s] history of disciplinary issues, as

---

[8] Mother later disclosed PGM "called her and told her that the father had contacted her (PGM) after he read her statements on the report. PGM told the mother that the father had threatened to kill her (PGM) and that she was afraid of the father. PGM told the mother that the father told her that if he lost custody of his children, it would be PGM's fault."

14

well as indicating that the dish soap was not toxic," DCFS concluded that Father "does not appear to take accountability for his actions when he used dish soap to discipline Travis."

### D.    *Father's Visits*

Father visited with Eli and Ariel twice a week, once at a DCFS office and once at a mall (Travis continued refusing visits). Visits went well, although there were several reports of Father communicating inappropriately with the children.

Travis reported that during a phone call with Father, Father asked him whether he would "man up and talk to him." Travis expressed he did not feel like Father treated him as a son, instead saying things that made him cry. Father told Ariel, "I'm going to fight for you; will you help me fight for you?" Ariel responded, "We're not supposed to talk about that stuff." Both Travis and Ariel reported Father threatened to give away their dog; Travis opined it was a tactic to make them want to live with him.

Father also expressed feelings of self-harm to the children. In a February 2025 phone call with the children, Father said, "I love you guys. And if I don't have you guys, I don't wanna be here." Mother ended the call because "the children got upset when they heard the father make this comment."[9]

___

[9] Mother reported Father made other comments, like: "I miss you guys; why don't you want to live with me anymore?" "I am fighting for you guys; will you fight with me?["] This stuff with DCFS will go on my record and look bad for me." "If you guys are not coming home, I will un-adopt Milo." "If you love me, you will come live with me." "Come live with me. It's not right what you're doing to me." Mother said these statements "really affected" the children.

The next day, a CSW called Father to discuss the inappropriateness of such comments. Father minimized the issue, saying, "Well, I just told them I would leave." Nevertheless, Father said he would call the children to explain he would not harm himself. The CSW asked him not to call the children to talk about case issues. The CSW opined that "the father did not accept accountability for his actions and the fact that he violated the Court['s] orders."

The day after the CSW called him, Father grabbed Travis by the arm after one of Travis's basketball games and hugged him, insisting Travis hug him back.[10] Father told him, "I miss you and love you. If you don't come home, I'm gonna end it." When Travis told him how much this would hurt Eli and Ariel, Father began crying, saying, "I need you, I need you."

In May 2025, Travis agreed to visit Father, but Mother reported it was because Father promised him ten dollars, "then told Travis Jr. that they were only 'making a bet.'" Father also told Travis "that the Court and Social Worker are working to help the mother put him in a Military School, however if he agreed to go back to the father's home, he would not have to go to Military School." Ariel and Eli also reported Father "sometimes whispers to them during the visits and Ariel reported that her father told her that the family dog misses them and that her friends have come over to his home looking for her."

---

[10] The court had permitted Father to attend the children's sporting events. However, the court specified that, unless it was an official, monitored visit, Father was to just "observ[e]" the game, and was not to "talk[] about case issues."

16

### E. *The Court Removes the Children From Father*

In late May 2025, the court held a combined adjudication and disposition hearing.

### 1. Adjudication

The court indicated it tentatively intended to sustain counts a-1, b-1, and j-1 only, and invited argument. Father's counsel stated Father's actions constituted reasonable discipline that was warranted by the circumstances. Counsel also contended Travis's estimates about how much dishwashing soap was used were not believable, and "perhaps a squirt or two is more likely what happened." On the one hand, counsel argued "kids having their mouths washed out with soap if they misbehave . . . is something that is kind of well known" and it was "not unreasonable to consider this as an alternative form of discipline." On the other hand, counsel asserted disciplining with dishwashing soap was a "lapse in judgment" that would not happen again. Counsel additionally argued that, if the court intended to sustain any portion of the petition, it should not do so as to Eli and Ariel, pointing out that Father's visits with them went well, and that those two children did not have the issues with school that Travis did. Finally, counsel asked in the alternative that the court strike certain allegations in the petition, such as that Father grabbed Travis by the hair, that dishwashing soap is poisonous if ingested, that Father used a "large quantity" of soap, that Travis was forced to hold the soap in his mouth for an "extended period of time," and that any event occurred on January 10, 2025. Counsel also asked the court to change allegations that Father "physically abused" Travis to an allegation that he "performed inappropriate discipline."

17

Travis and Eli's counsel asked the court to sustain the petition in its entirety, recounting the copious amounts of evidence supporting the allegations and arguing Father showed "a lack of remorse and accountability for his actions." She also disagreed that Father's actions constituted reasonable and warranted discipline.

Ariel's counsel opined the court could not sustain the count under section 300, subdivision (i) as to Ariel, because Ariel was not the child who suffered the cruel act. Counsel asked the court to sustain the rest of the petition as pleaded, also disputing Father's actions constituted reasonable and warranted discipline. Counsel reminded the court that Ariel said she was scared of Father, and that all three children reported Father used to hit them with a belt when they misbehaved.

DCFS's counsel argued Travis's issues at school were not out of the ordinary for a child his age. Regarding Travis's credibility, counsel pointed out that while Travis may have been mistaken about exact dates or the amount of soap used, he had been consistent in his recounting of events, which the other children corroborated. Counsel also disagreed that Father's action constituted reasonable and warranted punishment.

The court amended and sustained counts a-1, b-1, and j-1, and dismissed the remaining counts. As amended, the counts read in their entirety:

"On 01/28/2025, the children, Travis R[.] Jr., Eli R[.] and Ariel R[.]'s father, Travis R[.] Sr., physically abused the child Travis by grabbing and dragging the child by the child's hair. The father poured dishwashing soap into the child's mouth, causing the child dizziness, and a burning sensation to the child's throat and stomach. On 01/27/25, the father poured dishwashing

18

soap into the child's mouth, and forced the child to keep the soap in the child's mouth for an extended period of time, causing the child a burning sensation to the child's throat and stomach, and causing the child to vomit, including vomiting blood.  On 01/10/25, the father poured dishwashing soap into the child's mouth, and forced the child to keep the soap in the child's mouth. Such physical abuse was excessive and caused the child unreasonable pain and suffering.  The child does not feel safe, and does not want to reside in the father's home, due to the father's physical abuse of the child.  Such physical abuse of the child by the father endangers the child's physical health and safety, creates a detrimental home environment, and places the child, and the child's siblings, Eli R[.] and Ariel R[.], at risk of serious physical harm, damage, danger and physical abuse."

The court stated it believed Travis did his best to recount what had happened but also acknowledged his age may have "impacted the concepts of the amount."  The court noted one of the other children had said Father used a "spoonful" of dishwashing soap but concluded that "[w]hether it was a spoonful or not, it was inappropriate and it was not appropriate discipline."  The court found Father's actions were a form of "genuine discipline," but deemed it "excessive and not reasonable under the circumstances."  The court recognized a conflict in evidence regarding the amount of dishwashing soap used— whether a "spoonful" or "half a bottle"—and the length of time Travis had the soap in his mouth, but again concluded that "either way, it was not appropriate and it was not reasonable and it was excessive."

19

## 2.    Disposition

DCFS's counsel asked the court to remove the children from Father, place them with Mother, and grant Father monitored visits.  Father's counsel stated he would love to have all three children back but understood there were issues regarding Travis's return.  Therefore, Father asked the court to return Eli and Ariel to him, with orders that Father keep his cameras on whenever the children were with him, and that he not use physical punishment or have his children "ingest[] anything."  Father's counsel contended that, with such a safety plan, there was no clear and convincing evidence that Eli and Ariel would be in danger if released to Father.  Travis and Eli's counsel asked the court to remove the children from Father, pointing out the safety plan would be ineffective because Father had ignored court orders before.  Ariel's counsel also asked the court to remove the children from Father.  No party asked the court to institute an informal supervision plan under section 360, subdivision (b).

The court declared all three children dependents of the court, removed the children from Father, and placed them with Mother.  "Based on the evidence in the record," the court found by clear and convincing evidence there would be substantial danger to the children if they were returned to Father, and there were no reasonable means to protect them without removal.

Father timely appealed.

### DISCUSSION

### A.    *The Court Did Not Err in Assuming Jurisdiction*

Father contends the court erred in assuming jurisdiction because: (1) it failed to consider what amount of dishwashing

soap Father could have reasonably used to discipline Travis; and (2) substantial evidence does not support the court's finding that Father still presented a danger to the children at the time of the adjudication hearing. We address each contention in turn.

### 1. Amount of Dishwashing Soap

Although the court recognized a conflict in the evidence regarding the amount of dishwashing soap Father used to discipline Travis, it declined to resolve the conflict because "[w]hether it was a spoonful or not, it was inappropriate and it was not appropriate discipline."

Citing *In re D.M.* (2015) 242 Cal.App.4th 634, Father contends the court erred because, "[i]n relying on this categorical view [that any use of dish soap is unreasonable regardless of the circumstances], the juvenile court failed to properly consider the reasonableness of the amount of punishment in this case and also treated the implement of punishment (dish soap) as dispositive, which is not consistent with the law." Father misinterprets both *D.M.* and the juvenile court's statements.

In *D.M.*, the mother sometimes spanked her children on the buttocks with her bare hand or a sandal, but "not hard enough to leave marks or bruises." (*In re D.M.*, *supra*, 242 Cal.App.4th at p. 637.) The juvenile court assumed jurisdiction in part because it concluded that " 'hitting children with shoes is not a proper form of discipline, and it's physical abuse.' " (*Id.* at p. 638.)

The appellate court reversed, holding that "a parent's spanking of her children on the buttocks with her bare hand and with a sandal [does not] categorically constitute[] 'serious physical harm' sufficient to invoke dependency jurisdiction under section 300, subdivisions (a), (b) and (j), irrespective of whether the spankings qualify as reasonable parental discipline." (*In re*

21

*D.M.*, *supra*, 242 Cal.App.4th at p. 640.)  The appellate court noted the code excepted from the definition of "serious physical harm" "reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury."  (*Ibid.*, citing § 300, subd. (a).)  The court faulted the juvenile court for "not consider[ing] the genuineness, necessity, or reasonableness of mother's use of spanking as a disciplinary measure" and "treat[ing] the implement of punishment (a sandal rather than a hand) as dispositive."  (*Id.* at p. 642 [citing authority declining to hold use of wooden spoon for spanking " 'necessarily exceeds the bounds of reasonable parental discipline' "].)

Here, by contrast, no provision in the Welfare and Institutions Code excepts from the definition of "serious physical harm" the act of pouring dishwashing soap into a child's mouth. Nor does Father cite any authority holding that using dishwashing soap in any amount may be a reasonable form of discipline.  *D.M.* does not hold that, no matter the type of parental discipline, a court cannot categorically hold that any amount of it is excessive or unreasonable.  Moreover, the juvenile court did consider the reasonableness of the amount of dishwashing soap Father used and concluded even a spoonful— the smallest amount the court considered Father could have used—was excessive.  Father fails to demonstrate the court erred in reaching this conclusion.

### 2.    Substantial Evidence

Father also argues the court erred in assuming jurisdiction over the children because "the record lacked substantial evidence that there existed substantial risk of serious physical harm to the children."  While not entirely clear, Father seems to be arguing that DCFS contended Father was still a danger to the children

22

because he failed to take accountability for his actions, but the court erred in reaching the same conclusion because evidence supports a conclusion that he *did* take such accountability. Father does not appear to dispute that if he *had* failed to take accountability for his actions, the court would be justified in finding the children were still at risk, just that the court was not justified in finding he had failed to take accountability in the face of the contrary evidence laid out in his appellate brief.

Father acknowledges the existence of evidence supporting a conclusion he failed to take accountability. For example, during the initial investigation, when a CSW informed Father that ingesting dishwashing soap could have caused serious harm to Travis, Father did not dispute this but claimed "it wasn't that much soap." Later, Father (through counsel) sent DCFS information minimizing the dangers of putting dishwashing soap in Travis's mouth.

When a CSW asked Father what he would do differently regarding disciplining Travis, he initially stated he did not think he would do anything differently, and only changed his answer after noticing the CSW writing down his first answer.[11]

Further, although Father acknowledged Travis appeared in pain after Father poured the soap in his mouth—Father imitated this reaction by screaming loudly, coughing, and grabbing his throat until he was red in the face—Father refused to consider this might be Travis's honest reaction, instead insisting Travis

---

[11] Moreover, the juvenile court would have been justified in disbelieving Father's answer that he "would just stick to taking away electronics again or having them sit on a chair" given Father's claims that such discipline did not work, and that was what caused him to use dishwashing soap in the first place.

was "being dramatic" and acting like the "class clown." Father also admitted Travis spit up "red slime" after one such punishment but insisted it could not have been blood. On the night the police brought the children to the station, Father told Mother the police were taking the children away from him because Travis was doing things "for attention" and saying "I did things to him."

In May 2025, Father's parent partner reported that, when she discussed with him the inappropriateness of pouring dishwashing soap in Travis's mouth, Father justified his actions by saying his therapist told him to. The therapist, on the other hand, insisted she did not tell him to but instead suggested alternatives.

On this record, there is substantial evidence from which the court could have reasonably concluded Father had not taken accountability because he was still trying to blame others for his actions and was minimizing their severity.[12] In pointing out the evidence supporting a contrary conclusion, Father is essentially asking us to reweigh the evidence. This we cannot do.

---

[12] Thus Father's citation to *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738 is inapposite. There, the appellate court held that "the opinion of the mother's social worker and a therapist that she has not 'internalized' what she has learned in parenting classes" about corporal punishment was insufficient to support a finding of jurisdiction where "the evidence is undisputed that Blanca has said she has learned that she should not use excessive force in child discipline." (*Id.* at p. 1751.) Here, by contrast, the evidence is not undisputed that Father understood he should not have poured dishwashing soap into Travis's mouth.

24

" ' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' " (*In re S.R.* (2020) 48 Cal.App.5th 204, 219.) " ' " '[W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.' " ' " (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) Substantial evidence supports a finding that Father failed to take accountability for his actions and was therefore still a danger to the children.

## B. *The Court Did Not Err in Removing the Children*

"A dependent child shall not be taken from the physical custody of their parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor

25

from the minor's parent's . . . physical custody. . . ." (§ 361, subd. (c).)

As discussed above, evidence in the record supports a conclusion that Father did not think what he did to Travis was wrong. Moreover, there was ample evidence that Father previously beat all three of his children, and Travis had told a CSW that when Father "thinks CPS can't touch him, he is going to hit me again."

Evidence also supports a conclusion that Father would do what he could to limit the information reported to DCFS. Father threatened to kill PGM for the statements she made to DCFS because he thought they might contribute to his losing custody of the children. When the investigation began, Father told Ariel not to say anything about Father pouring dishwashing soap into Travis's mouth or about Father hitting her. Father also tried to emotionally manipulate the children throughout the case, threatening to kill himself, saying he would give away their dog if the children did not return, stating if they loved him, they would come live with him, insisting Travis hug him after a basketball game, and crying to Travis about how much he needed the children. Most egregiously, Father falsely told Travis, DCFS and Mother were working to send him to military school, something he could avoid if he moved back in with Father.

Father's actions support a conclusion that any measures put into place to ostensibly protect the children would be insufficient because Father had shown little compunction in violating court orders, in asking his children to withhold information from DCFS, in threatening adults who provided DCFS with information Father thought was harmful to him, and in trying to manipulate his children to return to his home.

26

On this record, even bearing in mind the requisite heightened standard, substantial evidence supports the court's finding that the children would be in substantial danger if returned to Father and no reasonable means short of removal could protect them.[13]

Father does not dispute this evidence exists. Instead, he lists other evidence that would support a contrary conclusion. Again, it is not our function to reweigh the evidence. If substantial evidence supports the court's finding—as it does here—we must affirm. (*In re S.R.*, *supra*, 48 Cal.App.5th at p. 219; *In re Misako R.*, *supra*, 2 Cal.App.4th at p. 545.)

### C. *Father Has Forfeited His Argument That the Court Should Not Have Declared the Children Dependents*

"If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301." (§ 360, subd. (b).)

Father's sole argument here is that "for all of the reasons set forth fully above, the court abused its discretion" because "[t]his family clearly did not need the formal supervision of the juvenile court."

---

[13] "On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence." (*In re Ashly F.* (2014) 225 Cal.App.4th 803, 809.)

DCFS contends Father forfeited this argument by failing to raise it below. (*In re D.P.* (2023) 92 Cal.App.5th 1282, 1292 ["In dependency proceedings, as elsewhere, a litigant forfeits an appellate argument by failing to raise it before the trial court"].) Father concedes he did not ask the court to proceed under section 360 but argues he did not forfeit the argument because "a challenge to the sufficiency of the evidence on an issue as to which the Department had the burden of proof is not forfeited by a parent's failure to object in the juvenile court." Whether or not that is true, Father cites no authority demonstrating DCFS had the burden of proof to demonstrate that supervision under section 360, subdivision (b) was unwarranted, nor does he argue on appeal that substantial evidence did not support such a decision. We agree Father forfeited this challenge.[14]

---

[14] Father also forfeited this argument by failing to support it with any reasoned argument or citation to authority. (*In re A.C.* (2017) 13 Cal.App.5th 661, 672 [" 'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived' "].)

## DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.